Catron, Ch. J.
delivered the opinion of the court.
The bill charges, that the bill of sale made in 1821, to Quinn and Elliston by Lanier and wife, was made with the intent to cover the slaves and defraud Lanier’s creditors. That the consideration paid, if any was paid, which complainant does not admit, was wholly inadequate, and is colorable, to hinder and delay creditors. The defendants are especially called upon to set out the circumstances of the purchase.
They say the purchase was absolute for the sum of thirteen hundred and thirty two dollars, due from Lanier to -Quinn and Elliston, and made at a full and fair price for the life estate, and they wholly deny all fraud. This is the joint answer of Quinn, Elliston and Lanier. They further state, that at the time Lanier and wife conveyed the negroes, Quinn and Elliston executed the following covenant: [Here the Judge recited the agreement before stated.]
Amy W. Lanier derived title to the slaves by virtue of the will of her father, Benjamin Goodrich, executed in Virginia in 1803. The devise is as follows: “I lend unto my daughter, Amy W. Lanier, the following negroes, (nine in number,) all during her natural life, and after her death, to the lawful heirs of her body, if there be any; if not, to be equally divided among my other children or their heirs.”
A material difficulty, and one that seems to have had a controlling influence on the cause below, is the construction of the foregoing covenant to the heirs of Amy W. Lanier. It is said Mrs. Lanier could not have any heirs, until her death, and therefore there were no covenantees. The will of Benj. Goodrich vested a life es-tato to the slaves in Amy W. Lanier, and the remainder in the heirs of her body. This in Virginia was a lawful devise to her children. Higginbotham vs. Rucker, 2 Call, 265. The record shows Amy W. Lanier had chil *103 dren living and adult at the time the evidence was taken in this cause. We think there can be no doubt the word heirs, is descriptive of the persons of those in remainder after the expiration of the mother’s life interest. So it is frequently used. 4 Kent’s Com. 220, 222. Had the children of Amy W. Lanier filed their bill on the covenant, alleged and proved a tender of the money by instal-ments to Quinn and Elliston, that they would have had a right to a decree for the slaves, and thereby extinguish the life estate of their mother, it is believed, cannot admit of serious doubt. When the bill of sale was taken from Lanier, the parties thought it was necessary Mrs. Lanier should join in the sale. It appears from the evidence of Moses Stevens and E. Goodrich, that she was unwilling the negroes should be sold, unless provision was made that they should return into the family, and that she did assent because of the covenant, there can hardly be a doubt. Judgments were hanging over the husband. He could not hold the negroes. She felt as every woman does and should feel, that to take away the negroes her father had given her, was taking from her part of her family, and a cruel necessity. Unfortunately, however, the father had not vested the slaves as separate property, and Mrs. La-nier’s title was subject to her husband’s debts. Her joining in the bill of sale was a mere nullity and unnecessary. Still, it was a wise provision to secure to the children the right to purchase the interest of Quinn and Elliston, so that they might have a more direct control of the slaves during the four years, or life of the mother. We |hink there is nothing in this paper going to show either fraud or trust, as between Quinn and Elliston and Edmund Lanier.
In the next place, was the bill of sale from Lanier to Quinn and Elliston fraudulent as to creditors? That they paid the thirteen hundred and thirty two dollars, is as substantially proved as could reasonably be expected, after the lapse of such a length of time. There is no good reason to doubt it. Amy W. Lanier was about fifty *104 years of age when it was made, a feeble and frail woman of shattered constitution, and unlikely to live long. Most of the negroes were young and an expense to the purchasers of the life estate. The witnesses prove, and especially Mr. Grundy, that'the price paid was a full and fair one. > Indeed, it was a contingent interest that no prudent man would have dealt for, unless to save a doubtful claim, if he intended to deal fairly by those entitled in remainder; that is, keep the negroes together, and take the care of them a prudent man should of his own, and especially the women and children. Had Quinn and Elliston acted differently, they would have been subject to have the slaves impounded in their hands, and to pay damages. Smith T. vs. Bell and wife, Martin and Yerger, 305. It is pressed as a badge of fraud, that Lanier, contrary to conscience, in avoidance of the payment of his other just debts, and in a secret manner, conveyed the whole of his slaves to Quinn and Elliston. Judgments were certain to be recovered against him very shortly. To permit a levy and sale of the negroes would have produced a separation of them, and threatened destruction to the title of his children. That he selected the creditors to whom he conveyed tire slaves, with a view to his children’s interest, we do not doubt. He conveyed to separate creditors jointly, when he owed Elliston only about three hundred and fifty dollars, to secure the responsibility of the latter to his children. He obviously preferred this man to Grundy, Hickman and his other creditors. This he had a right to do, if he received a fair price, and the sale was made in good faith.
But the main ground on which relief is sought by the bill is, that Quinn and Elliston had hired the negroes, and from their hire received their debts, and therefore they ought to surrender them to Hickman.
Contrary to any prudent calculation, Amy W. Lanier is yet living. Quinn and Elliston had the possession, and received the hire of the slaves from March, 1821, to *105 October 1827, when Hickman filed his bill. This supposed foot of relief, is rested on time and chance. There was not the slightest ground for the assumption in 1821, that Quinn and Elliston could be compelled to take their debt out of the hire. Their chance of not being paid rested upon the highly probable contingency of Mrs. Lanier’s death at an early day, and also on that of the death of the adult slaves, some of whom did die. It was in its nature a risking bargain, not open to impeachment by either party, or creditors, should it turn out ill or well.
It is next assumed, that the contract made by Lanier was a mortgage, and Hickman as a judgment creditor, entitled to redeem from Quinn and Elliston. This is not charged in the bill, but as the decree below proceeded upon the assumption, it will be briefly examined. Laying the covenant to the heirs out of the case, and of course the right to redeem rests on parol proof. That such proof may be received to show the redeemable quality of the absolute bill of sale, is too well settled to be shaken. But to do this the proof must be so clear as not to admit of a doubt that the contract was made subject to the condition, not reduced to writing through fraud, mistake, accident, &c. The reason the proof must be plain is, that the presumption is strongly opposed to the existence of such a defeasance. In addition to the presumption in this case, the witnesses prove that the debts of Quinn and Elliston were discharged. This is in affirmance of the answer of all the parties. Had the bill of sale only been a security for the money, Lanier would at all times have been subject to be sued, and the debt recovered from him. Had Mrs. Lanier died the next month after the contract was made, Quinn and Elliston could have sought their remedy against Lanier. We think that if any thing is plainly manifest from this record, it is, that Quinn and Elliston parted with their remedy.
To prove the condition, the evidence of James Condon is first relied upon. He was a subscribing witness to the *106 bill 0f sale. When they left Lanier’s house, he asked Quinn if he thought he and Elliston were secure? Quinn answered, ‘Conditionally; that is, if Mrs. Lanier lives long enough.’ That this expression of Quinn had reference to the contingency on which their right to the use of the negroes rested, and nothing more, can hardly be doubted.
2. The evidence of Edmund Goodrich is relied on. He says, in the latter part of the spring or early part of the summer of 1827, before the filing of the bill, he had a conversation with Elliston, (having been requested to 'do so by Lucy Lanier, one of the daughters, and Mr. La-nier and his wife,) when Mr. Elliston stated he wished to make over the negroes for the benefit of Mr. Lanier and the balance of the family. That he had from the hire received the amount he claimed; or that the hire that year would amount to within twenty dollars of paying him, or would over pay him twenty dollars. Witness understood from Elliston that he did not conceive himself bound to make the conveyance to the children or any other person, but that his wish to do so arose from his friendship to Mr. Lanier and his family; and that El-liston had previously proposed to do so, for which reason, Goodrich, the brother of Mrs. Lanier, was sent to him. Elliston said, and Goodrich understood, the act proposed by Elliston was one of charity, and there is no evidence in the record to contradict it. A man of opulence and high standing, and who acted on the precept of doing unto others as he would be done by, under a change of conditions, had hardly another course left him. To such men the moral sense of the surrounding community is, and ought to be, the standard of their moral conduct. We think there is nothing in this circumstance.
Next it is insisted, some of the slaves, after the bill of sale was made, continued in the possession of Mr. La-nier. They were women and children worth nothing to Quinn and Elliston. To have taken thorn away if they wore of use to the family, would, to say the least of it, *107 have been uncharitable. To cut off all opportunities for the exercise of the charities of life, in such cases, would be an attempt, on the part of the courts, as unwise, as in this country it has been found to be impossible. To test all these circumstances of fraud, Hickman caused some of the negroes to be seized and sold by virtue of his execution, and sued Quinn in detinue for them. The result was a verdict for the defendant.
Hickman’s case is a very hard one. He has suffered as a security, and is an object of great commiseration, which resulted no doubt in a decree in his favour below; and$ was there any ground of relief known to a court of chan-eery, it would afford us great satisfaction to decree him the hire in the hands of Quinn and Elliston during the progress of this suit, in satisfaction of his favor-ed and meritorious demand. A court- of equity having no such power on any recognized principle, we must leave him to the humanity and moral sense of the defendants. The complainant will pay his own costs, and the defendants jointly pay the defendants’ costs, and the bill be dismissed.
Whyte J. concurred: Peck, J. absent, being related; and GREEN J. gave no opinion.
Bill dismissed.*

The defendants, after deducting their expenses, attorney’s fees, &e. and after payment of all the costs in the cause, voluntarily ga’ve to the plaintiff, all the hire over and above their principal debt and interest. They also voluntarily conveyed the slaves to the children of Mrs. Lanier.